**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

CITY OF NEW BOSTON, TEXAS,
individually and on behalf of all others
similarly situated,

         Plaintiff,

v.

NETFLIX, INC. and HULU, LLC,

         Defendants.

Civil Action No. 5:20-cv-00135-RWS

JURY TRIAL DEMANDED

**ORAL HEARING REQUESTED**

**DEFENDANT NETFLIX, INC.'S OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................1

II.    PLAINTIFF'S CLASS CERTIFICATION MOTION SHOULD BE DENIED .................3

    A.    Plaintiff Has Not Established Numerosity ................................................3

    B.    Plaintiff Is Not An Adequate Class Representative ..................................4

    C.    Plaintiff's Claims Are Not Typical Of Those Of The Proposed Class ...................8

    D.    Plaintiff Has Not Satisfied And Cannot Satisfy Commonality, Much Less Cohesion Or Predominance ........................................................9

    E.    Class Certification Is Improper Under Both Rule 23(b)(2) And Rule 23(b)(3) Given Additional City-Specific Defenses ...............................16

    F.    Class Certification Is Improper Under Rule 23(b)(3) For Additional Reasons .............................................................................16

        1.    Plaintiff's Damages Method Is Inconsistent With Its Liability Theory ..............................................................................16

        2.    A Class Action Is Not A Superior Method For Resolving This Dispute ..............................................................................17

III.    CONCLUSION ............................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abrams v. Kelsey-Seybold Med. Grp., Inc.*,
  178 F.R.D. 116 (S.D. Tex. 1997) ............................................................................4

*Allison v. Citgo Petroleum*,
  151 F.3d 402 (5th Cir. 1998) ..................................................................15, 17, 18

*Amchem Prods. Inc. v. Windsor*,
  521 U.S. 591 (1997)............................................................................................6, 18

*Ball v. Union Carbide*,
  385 F.3d 713 (6th Cir. 2004) ...............................................................................11

*Berger v. Compaq Comput. Corp.*,
  257 F.3d 475 (5th Cir. 2001) ................................................................................4

*Casa Orlando Apartments v. Fed. Nat. Mortg. Ass'n*,
  624 F.3d 185 (5th Cir. 2010) ................................................................................6

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)............................................................................2, 3, 16, 17

*Complete Auto Transit, Inc. v. Brady*,
  430 U.S. 274 (1977)..............................................................................................16

*Cruson v. Jackson Nat'l Life Ins. Co.*,
  954 F.3d 240 (5th Cir. 2020) ........................................................................3, 16

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
  829 F.3d 370 (5th Cir. 2016) .......................................................................11, 15

*Flecha v. Medicredit, Inc.*,
  946 F.3d 762 (5th Cir. 2020) ................................................................................9

*FPX, LLC v. Google, Inc.*,
  276 F.R.D. 543 (E.D. Tex. 2011)......................................................................15, 16

*Ibe v. Jones*,
  836 F.3d 516 (5th Cir. 2016) ................................................................................4

*Ituah by McKay v. Austin State Hosp.*,
  2020 WL 354949 (W.D. Tex. 2020)......................................................................3

*Langbecker v. Elec. Data Sys. Corp.*,
    476 F.3d 299 (5th Cir. 2007) ....................................................................4, 6, 7

*Madison v. Chalmette Ref., L.L.C.*,
    637 F.3d 551 (5th Cir. 2011) ...............................................................................15

*Miller v. Grand Canyon Univ.*,
    No. 4:20-cv-00652-P, 2021 WL 1996564 (N.D. Tex. May 19, 2021) .....................................8

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998)..........................................................................................9

*Ned-Sthran v. Methodist Hosps. of Dallas*,
    No. CIV. A. 3:08-cv-0072-K, 2008 WL 5420601 (N.D. Tex. Nov. 25, 2008) ........................7

*Petition of NTCA – The Rural Broadband Association and the United States Telecom
    Association for Forbearance Pursuant to 47 U.S.C. § 160(c) from Application of
    Contribution Obligations on Broadband Internet Access Transmission Services*,
    Order, 33 FCC Rcd 5712 (2018).............................................................................14

*Randleman v. Fid. Nat'l Title Ins. Co.*,
    646 F.3d 347 (6th Cir. 2011) .................................................................................3

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
    91 F. Supp. 2d 942 (E.D. Tex. 2000)......................................................................18

*Steering Comm. v. Exxon Mobil*,
    461 F.3d 598 (5th Cir. 2006) ...............................................................................17

*M.D. ex rel. Stukenberg v. Perry*,
    675 F.3d 832 (5th Cir. 2012) ...........................................................................9, 15

*Tex. Utilities Fuel Co. v. Marathon Oil Co.*,
    No. 11-98-00079-CV, 2000 WL 34234653 (Tex. App. Mar. 9, 2000) .................................16

*Verde v. Stoneridge, Inc.*,
    No. 6:14-cv-225, 2017 WL 2257172 (E.D. Tex. May 23, 2017) .......................................15

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)....................................................................................15, 16

*Zachery v. Texaco Expl. & Prod., Inc.*,
    185 F.R.D. 230 (W.D. Tex. 1999) ...........................................................................9

## STATUTES

47 U.S.C.
 § 151 ............................................................................................................8
 § 332(d) ....................................................................................................1, 3
 § 522(5) .......................................................................................................13
 § 522(7)(C) ..................................................................................................13
 § 522(20) .....................................................................................................11
 § 1101(a)(2) ...................................................................................................8
 § 1105(3) .......................................................................................................8
 § 1105(8) .......................................................................................................8
 § 1105(8)(A)(i) ...............................................................................................8

Tex. Transp. Code
 § 201.672(a) .................................................................................................11
 § 228.011(b-1) .............................................................................................11

Tex. Util. Code
 § 66.002(5) .....................................................................................................8
 § 66.002(6)(A) ...................................................................................4, 5, 14, 17
 § 66.002(8) ...................................................................................................11
 § 66.002(9) ...................................................................................................11
 § 66.002(10) ...........................................................................................*passim*
 § 66.005(c) ..............................................................................................7, 16

Texas Admin. Code § 3.313(a)(4) ...............................................................18

## OTHER AUTHORITIES

Texas Dep't of Transportation, *State Purchase of Right of Way*,
 https://ftp.dot.state.tx.us/pub/txdot-info/row/row-overview-white-paper.pdf ........................11

## I.  INTRODUCTION

Much like a physical library, Netflix offers an on-demand library of streaming content. Its content is *not* live, linear, channelized, scheduled, or programmed.[1]  Nor is it disseminated over the airwaves like broadcast television.  Netflix users instead request to stream content *anywhere*, *any time*, and *in any amount* they desire so long as they have a broadband Internet connection.  The only court to consider the evidence found that Netflix does not provide content comparable to television broadcast programming, Op. & Order (Ex. 17) 12-15, and Netflix also has no facilities, networks, or equipment in any Texas public rights-of-way ("ROWs").

The City of New Boston ("Plaintiff") nonetheless seeks to represent a class of "[a]ll Texas municipalities in which one or more of the Defendants has ***provided video service***."  Pl.'s Mot. (Dkt. 75) ("Mot.") 6.  Plaintiff fails, however, to establish *any* of the requirements of Rule 23.  Whether each Defendant ***provides video service***, as defined in § 66.002(10) of Tex. Util. Code § 66.001 *et seq.* (the "Act"), implicates a host of city-specific questions, including whether (1) each Defendant provides "video programming" (as statutorily defined); (2) in each city; (3) "through wireline facilities located at least in part in the public right-of-way" of the city; (4) but that is *not* "provided by a commercial mobile service provider as defined in 47 U.S.C. § 332(d)."  Plaintiff fails to show numerosity because it presents no evidence of the number of municipalities (if any) in which each Defendant "provides video service," and it admits that the issue raises core ***merits*** questions.

Plaintiff also is an inadequate class representative, and its claims are not typical.  Plaintiff

---

[1] Netflix submits several factual declarations to provide relevant background.  C. Long Decl. (Ex. 4); Z. Gorman Decl. (Ex. 5); M. Smith Decl. (Ex. 6); B. Middleton Decl. (Ex. 7); M. Mirkovski Decl. (Ex. 8). Plaintiff agrees that the Ohio deposition transcripts of its experts David Malfara and David Simon can be used in this matter and that all references to Ohio and the Ohio statute in Mr. Simon's transcript may be construed as references to Texas and the Texas statute at issue here.  M. Alexander Decl. (Ex. 14) ¶¶ 2-3. Netflix also incorporates the arguments in Hulu's opposition brief.  Finally, all emphasis is added, and all quotations and citations are omitted herein.

did not consult any other city before filing this case, yet believes it can decide for all other cities that their residents should pay more in fees.  It then proposes a damages approach that would assess fees *only* on Netflix subscribers who have physical addresses in a city, ignoring that many non-residents stream content in that city too.  While that model may suit New Boston, which is likely to have relatively little non-resident viewing within its city limits, it does detriment to many Texas cities with college populations, tourism, and business travel.  Plaintiff's model also untethers the franchise fee from its supposed purpose of providing "rent" for accessing the public ROWs, and Plaintiff uses the "franchise taxes" it already receives as "general funds," making Plaintiff especially vulnerable to a defense under the Internet Tax Freedom Act ("ITFA").  Plaintiff also claims it has *discretion* to impose a fee on Netflix content but not on the content of other similarly situated providers, which violates the First Amendment.

Commonality, cohesion, and predominance are also lacking.  Determining whether two unique Defendants provide "video service" requires city-by-city inquiries.  Even if Netflix were the only Defendant, Netflix does not have physical addresses for its customers.  It also cannot be determined on a classwide basis which public ROWs a city owns, whether those ROWs have wires through which Internet service providers ("ISPs") *could* deliver Netflix content, or whether content is *in fact* delivered through those wires as opposed to through satellite, mobile, fixed wireless, or other exempted services.  The answer to these questions would also vary by city and over time, both retrospectively and prospectively, such that any damages model developed today would not be adequate to calculate past damages or future fees.  Calculating classwide damages is thus impossible.  Plaintiff's damages theory (based on the physical addresses of subscribers regardless of where content is streamed) is also inconsistent with its liability theory (based on revenues derived from Netflix's alleged operations in a city), in violation of *Comcast Corp. v.*

*Behrend*, 569 U.S. 27 (2013).   Fact-intensive questions also exist as to whether each city relinquished its right to seek fees based on its prior knowledge of Netflix's service.   Class litigation is neither manageable nor superior, and the Court should deny Plaintiff's Motion.

## II.   PLAINTIFF'S CLASS CERTIFICATION MOTION SHOULD BE DENIED

The Court can certify Plaintiff's proposed class only if, after a "rigorous analysis," it is satisfied that Plaintiff has met its burden on each of the prerequisites for certification.[2]   *Cruson v. Jackson Nat'l Life Ins.*, 954 F.3d 240, 253 (5th Cir. 2020).   Plaintiff has not met its burden here.

### A.   Plaintiff Has Not Established Numerosity

Plaintiff proposes a class of "[a]ll Texas municipalities in which one or more of the Defendants ***has provided video service***," and it defines "video service" based on the Act's statutory definition.   Mot. 6, 9; Compl. ¶ 9 nn. 1-3.   Whether Netflix or Hulu has "provided video service" at all, or in a particular city, such that the city is a proposed class member, requires a city-by-city determination on key ***merits*** issues, including whether (1) Defendants provide "video programming"; (2) in the city; (3) "through wireline facilities located at least in part in the public right-of-way" of the city; (4) but that is *not* "provided by a commercial mobile service provider as defined in 47 U.S.C. § 332(d)."   Tex. Util. Code § 66.002(10).[3]

These questions raise complex merits inquiries, as discussed in detail below, yet Plaintiff asserts that the proposed class "can be readily ascertained from public records" and consists of "at least 1,000 members."   Mot. 7, 8.   Plaintiff, however, merely cites the Census, which does

---

[2] Plaintiff did not seek to take a single deposition of any of Netflix's witnesses, and Plaintiff relies only on two experts who testified they are ***not*** opining on the points for which Plaintiff cites them, as shown in the attached Chart & Excerpts of Plaintiff's Experts' Testimony (Ex. 1).

[3] Plaintiff's class definition thus depends on a determination of the merits, which other Circuits have found improper because it "shields the putative class members from receiving an adverse judgment," *Randleman v. Fid. Nat'l Title*, 646 F.3d 347, 352 (6th Cir. 2011), and even in the Fifth Circuit, it is not sufficient to merely plead a fail-safe class, as Plaintiff does here.   *Ituah by McKay v. Austin State Hosp.*, 2020 WL 354949, at *7 n.11 (W.D. Tex. 2020).

not identify cities "*in which one or more of the Defendants has provided video service*."  *See id.*
at 8.  Plaintiff has thus not provided "evidence or [a] reasonable estimate of the number of
purported class members," as required.[4]  *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016); *see also*
*Abrams v. Kelsey-Seybold Med. Grp., Inc.*, 178 F.R.D. 116, 128 (S.D. Tex. 1997) (plaintiff
"failed to introduce any evidence" of numerosity and instead "only speculated").

## B.    Plaintiff Is Not An Adequate Class Representative

"[B]ecause absent class members are conclusively bound by the judgment in any class
action brought on their behalf, the court must be especially vigilant to ensure that the due process
rights of all class members are safeguarded through adequate representation at all times."  *Berger*
*v. Compaq Comput.*, 257 F.3d 475, 480 (5th Cir. 2001).  Plaintiff is an inadequate representative
because its interests conflict with those of "the class [it] seek[s] to represent."  *Langbecker v.*
*Elec. Data Sys. Corp.*, 476 F.3d 299, 314-15 (5th Cir. 2007) (remanding due to intra-class
conflicts where different legal theories would lead to different  recoveries for class members).

The Act requires a video service provider to pay a municipality 5% of its gross revenue
"derived . . . from the operation of . . . the video service provider's network to provide . . . video
service within the municipality."  Tex. Util. Code § 66.002(6)(A).  Plaintiff proposes a model

---

[4] Plaintiff's experts are *not* opining that Netflix provides video programming under the Act and *do not*
*know* if Netflix has facilities in Texas ROWs.  Malfara 4/29/21 Tr. (Ex. 15) 84:25-85:2, 104:24-105:2,
112:8-22, 132:2-16; Malfara 6/8/21 Tr. (Ex. 13) 35:9-36:2; 43:23-44:11; 90:11-17; 96:20-24, 103:2-12;
Simon Tr. (Ex. 16) 62:6-9, 117:12-23.  The evidence shows that Netflix does not provide "video service"
*anywhere*.  Netflix does not provide "programming": its content is not disseminated over the airwaves and
is instead accessed over the Internet.  It is not live, channeled, or linear, and it is not subject to FCC rules
applicable to television broadcast stations, cable operators, or multichannel video programming
distributors, as Mr. Middleton, Netflix Lead, U.S. Federal Policy and former FCC attorney, explains.
Middleton Decl. ¶¶ 3-9; Simon Tr. 95:25-98:8, 101:4-7, 103:22-24, 104:21-105:6, 130:20-132:20, 133:5-
8, 138:21-139:8, 140:8-19, 165:15-166:16, 169:7-170:21, 172:3-6, 179:25-181:20; S. Turner Report (Ex.
9) ¶¶ 14-36; Long Decl. ¶¶ 3-8; Op. & Order (Ex.17) 12-14.  Netflix does not own, operate, or use any
wires in any public ROWs, and its content is streamed by subscribers to commercial mobile service.
Smith Decl. ¶¶ 6-14; Turner Report ¶¶ 38-49, 84-85; Malfara 4/29/21 Tr. 107:5-21, 108:23-25; Malfara
6/8/21 Tr. 40:7-44:10; 46:4-15; Simon Tr. 75:15-25; Tex. Util. Code § 66.002(10).

under which gross revenue for purposes of assessing a fee is determined by adding up all subscription fees paid by customers with "service addresses" in a particular city, *even though* the phrase "service addresses" does not appear in the Act and *even though* Plaintiff does not define it.  Mot. 19.  Plaintiff's model includes fees paid by customers with "service addresses" in a particular city, *even if* those customers do not stream all, or any, Netflix content at that address or in that city.  *Id.* at 5 (arguing the fee is calculated the same "regardless of whether Defendants' video programming is viewed by New Boston residents *outside* the City").  Reciprocally, under Plaintiff's model, a city is *not* entitled to a percentage of the gross revenue associated with content streamed by customers without a permanent address in that city (e.g., tourists, business travelers, students), *even if* that content is provided by ISPs through the wireline facilities in that city's ROWs.  *Id.* (arguing the fee is calculated the same "regardless of whether Defendants' video programming is viewed . . . by non-residents *inside* the City").

Cities like Plaintiff—which have no tourist attractions or colleges and relatively few visiting non-residents—benefit from Plaintiff's "service addresses" model, but the model disadvantages other members of the proposed class (as Dr. Jesse David, an economist with a Ph.D from Stanford University, explains).  *See* J. David Report (Ex. 10) ¶¶ 60-85; *see also* Lea Tr. (Ex. 12) 19:17-20:4.  Indeed, the Act refers to gross revenues as being derived "from the operation of . . . the video service provider's network to provide . . . video service within the municipality."  Texas Util. Code § 66.002(6)(A).  Applying that concept here,[5] gross revenues would be calculated based on the location(s) where content is streamed through wirelines in the public ROWs, regardless of residential, billing, or other permanent physical address.  A city

---

[5] As explained in Netflix's Motion to Dismiss (at 9-10), Netflix does not operate a "network" under the Act and does not transmit its content directly to subscribers. Netflix's content is requested by a customer and delivered over the Internet by an ISP.  *See* Turner Report ¶¶ 25-29.

would thus be entitled to a fee assessed against all gross revenues associated with video programming provided over wireline facilities in the city's public ROWs, *regardless of whether* that programming is watched by individuals with physical addresses in the city.  Cities with large non-resident populations would receive more benefit under such a model, as they could seek to recover fees related to content streamed by tourists, business travelers, college students, commuters, and other visitors in the city—fees they would not receive under Plaintiff's model. David Report ¶¶ 64-85 (case studies); Gorman Decl. ¶ 4 (Netflix subscribers with Texas billing zip codes watched content using IP addresses associated with approximately five different cities in four-week period); Malfara 4/29/21 Tr. 70:7-71:7; Malfara 6/8/21 Tr. 33:24-34:12.

Plaintiff's financial interests thus conflict with the interests of other proposed class members, making Plaintiff an inadequate representative.  *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 626 (1997); *Langbecker*, 476 F.3d at 314-15.  That conflict of interest is especially problematic here, where Plaintiff seeks to certify a mandatory class under Rule 23(b)(2), which does not require that class members be given notice and an opportunity to opt out.  *Langbecker*, 476 F.3d at 317 (certifying a (b)(2) class with conflicting interests is "extremely troubling" given lack of notice and opt out); *Casa Orlando Apartments v. Fed. Nat. Mortg. Ass'n*, 624 F.3d 185, 199-200 (5th Cir. 2010) (finding a (b)(2) class inappropriate because "individuals who could possibly obtain a larger judgment outside of the class ha[d] no opt-out opportunity").

Plaintiff's City Administrator, who has decision-making authority for this lawsuit, did not consult any other city regarding this lawsuit or the possibility that it will increase taxes on each city's residents.  Lea Tr. 26:15-18, 36:14-16, 70:20-72:6, 125:14-18, 127:8-128:4.  She instead is bringing this action "because it's the right thing to do for [New Boston]."  *Id.* at 99:25-100:5, 126:18-19.  She admits she has "no idea how any other city feels about this lawsuit," nor does

she "feel the need to learn what other cities might want." *Id.* at 71:2-8, 128:2-4.  She also does not "have a problem with forcing" other cities "into the class" even though she does not understand "any potential First Amendment implications of the decision" and even though it "might expose them to counterclaims and liabilities." *Id.* at 145:2-146:7.  Nor is she concerned that the franchise fee might fall "on the backs of [the city's] residents." *Id.* at 105:2-16.

Other Texas cities feel differently.  Many Texas cities have *reduced* the fees paid by their residents, and others have *rejected* efforts to increase fees, as shown in the attached Chart of Local Tax Reductions (Ex. 2).  As one Pearland Councilmember stated, "I'm still not sold on why we should pass an increase in fees during the pandemic."  "How do you look a citizen in the eye and say, 'I voted for that'?" *Id.* at 6.  Yet Plaintiff's suit would do just that, and in a manner that many cities may find particularly objectionable.  Plaintiff seeks to impose a fee "regardless of whether Defendants' video programming is viewed . . . by residents via mobile devices," even though the Act excludes from the definition of "video service" content provided over mobile service.  Mot. 5; Tex. Util. Code § 66.002(10).  As Dr. Ray Perryman, a Ph.D. in economics and the 2012 Texan of the Year, explains, low-income, younger, and minority populations are more likely to access the Internet using mobile service.  R. Perryman Report (Ex. 11) ¶¶ 33-51.  Because the franchise fee can be passed on to customers (Tex. Util. Code § 66.005(c)), Plaintiff's model would not only raise residents' fees but would also unfairly tax these subpopulations who are not receiving "video service" (or not to the same degree). *Id.* ¶¶ 49-51.

By attempting to force all Texas cities to impose fees on internet content providers like Netflix, thereby increasing the fees their residents pay regardless of how content is streamed, Plaintiff is not adequately representing the class it seeks to certify. *Langbecker*, 476 F.3d at 315; *Ned-Sthran v. Methodist Hosps. of Dallas*, 2008 WL 5420601, at *4 (N.D. Tex. Nov. 25, 2008).

### C.      Plaintiff's Claims Are Not Typical Of Those Of The Proposed Class

Where a named plaintiff is subject to "defenses unique to it," typicality is lacking.  *Miller v. Grand Canyon Univ.*, 2021 WL 1996564, at *5–6 (N.D. Tex. May 19, 2021).  Typicality is lacking here, because the evidence shows that New Boston is particularly vulnerable to both an ITFA and a First Amendment defense in light of its approach to allocating and imposing franchise fees.

*First*, Plaintiff is susceptible to a defense based on the ITFA.  The ITFA prohibits a city from imposing a charge on the delivery of services over the Internet if it is not imposed to defray a particular cost or for a specific privilege or benefit conferred, and is instead imposed for general revenue-raising purposes.  *See* 47 U.S.C. § 151 (note), §§ 1101(a)(2), 1105(3), (8).  Plaintiff admits it has not given Netflix a specific privilege, has not been harmed by Netflix, and channels the franchise fee (which it labels a "franchise tax") into its general fund.  Lea Tr. 60:22-61:19, 62:19-63:22, 69:5-22, 75:19-25; New Boston 2020-21 Budget (Ex. 19); 2019 New Boston Audit (Ex. 20) at 9-10.  By then defining "gross revenues" to refer to revenues based on "service addresses" *regardless of* where or how content is viewed, Plaintiff espouses a damages theory that divorces the fee from the alleged use of wireline facilities in the public ROWs.  *Supra* at 4-6.  That approach is contrary to the economic theory underlying franchise fees, which are designed to compensate cities for the construction and maintenance of wireline facilities in the public ROW.  Perryman Report ¶¶ 23-32; Tex. Util. Code § 66.002(5).  Plaintiff's theory thus renders it susceptible to the defense that the fee is not merely rent for use of the ROWs but is instead an improper tax "for the purpose of generating revenues for governmental purposes."  47 U.S.C. § 151 (note), § 1105(8)(A)(i); *see also* Mot. to Dismiss (Dkt. 19) at 15-17.

*Second*, Plaintiff is uniquely subject to the argument that it is seeking to violate the First Amendment and the Fourteenth Amendment's Due Process Clause, under which "speakers are

protected from arbitrary and discriminatory enforcement of vague standards." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).  Plaintiff believes imposition of the fee should be based on an analysis of the quality, format, and genre *of the content* and that such a *content-*based approach is appropriate.   Simon Tr. 230:17-231:2, 238:22-239:5, 240:3-20, 247:14-23.  The City Administrator also testified that she has discretion to seek a fee only from Netflix and Hulu and not similarly situated content providers and that New Boston has no plan to identify other content providers that should be paying a fee.  Lea Tr. 44:3-45:6, 48:25-49:2, 73:24-74:6, 89:22-90:10, 93:22-94:1, 100:13-20, 108:3-17; *see also* Pl.'s Resp. to Interrog. No. 14 (Ex. 18).[6]

### D.    Plaintiff Has Not Satisfied And Cannot Satisfy Commonality, Much Less Cohesion Or Predominance

Plaintiff cannot show commonality, which requires "the capacity of a class-wide proceeding to generate *common answers* apt to drive the resolution of the litigation."  *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 767 (5th Cir. 2020); *see also M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (commonality not established "merely by alleging a violation of the same legal provision by the same defendant").

***Netflix Does Not Have Physical Addresses For Its Customers:*** Plaintiff bases its damages theory on the "service addresses" of Netflix customers.  Mot. 19.  That phrase, however, does not appear in the Act, and Plaintiff does not define it.  Netflix customers can stream content wherever they are in the United States as well as in more than 190 countries so long as they have a broadband Internet connection.  Smith Decl. ¶ 3.  Netflix does not have or need its streaming customers' physical addresses, and following established privacy principles, Netflix does not collect data that it does not need.  Long Decl. ¶¶ 15-18.  Netflix has billing zip

---

[6] In addition, the individualized issues discussed below (at 9-15) defeat typicality because those issues will require "individually tailored" analyses which are not "'typical' for all class members."  *Zachery v. Texaco Expl. & Prod., Inc.*, 185 F.R.D. 230, 240 (W.D. Tex. 1999).

codes associated with some of its streaming customers, *id.* ¶¶ 16-17, but even for those customers, it is not possible to accurately identify the city in which the customer has a billing address, as more than 77% of zip codes in Texas cover more than one municipality.  Turner Report ¶ 55.

      ***Classwide Proceedings Cannot Generate Any Common Answers With Respect To Two Unique Defendants, And Predominance Is Also Lacking:*** Plaintiff wrongly asserts that a classwide proceeding will generate answers to questions of fact and law common to *both* Netflix *and* Hulu.  Mot. 8-9.  But Netflix and Hulu are independent companies that offer unique services, use proprietary technologies, and have unique subscribers.  Long Decl. ¶¶ 3, 14; Malfara 4/29/21 Tr. 133:23-134:17, 141:13-18; Malfara 6/8/21 Tr. 100:5-101:17; Simon Tr. 106:11-108:8.  As a result, determining (1) whether Netflix *and* Hulu provide "video programming," (2) whether Netflix *and* Hulu do so "through wireline facilities located at least in part in the public right-of-way," (3) whether the video content of Netflix *and* Hulu is provided "by a commercial mobile service provider," and (4) the number and location of Netflix *and* Hulu's subscribers cannot be answered based on common proof.

      Plaintiff's experts admit that Netflix and Hulu do not offer the "same content," do not "transmit their content in the same manner," and use "mutually exclusive" servers.  Malfara 4/29/21 Tr. 134:14-17, 180:13-16, 133:23-134:2; 141:13-18; Malfara 6/8/21 Tr. 100:5-101:17; *see also* Simon Tr. 60:21-62:1.[7]  Netflix offers **no** live or channeled content, while Hulu offers live feeds from local television and cable channels, making the determination of whether each

---

[7] Plaintiff's experts admit they are ***not*** opining "that Netflix and Hulu provide the exact same video programming," "that Netflix and Hulu provide video programming delivered in the exact same manner," or that Netflix and Hulu do so "no matter where their subscribers reside in the state of Texas."  Malfara 6/8/21 Tr. 100:5-11, 101:11-17; Simon Tr. 60:25-61:10, 61:15-20.  They also are not opining whether the determination of whether Netflix and Hulu provide video service under the Act could be answered in a common way for all Texas cities.  Malfara 6/8/21 Tr. 104:11-23; Simon Tr. 59:22-60:1, 105:15-20; Chart & Excerpts of Pl.'s Experts' Testimony.

Defendant offers "video programming" different.  Simon Report (Dkt. 75-2) ¶ 34; Simon Tr. 107:4-108:3; Long Decl. ¶¶ 4-6; Turner Report ¶¶ 19-24; Tex. Util. Code § 66.002(9); 47 U.S.C. § 522(20).  Defendants have not engaged in a "single course of conduct," and commonality and predominance are lacking.  *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 378-79 (5th Cir. 2016) (certification improper given "different acts committed by different defendants"); *Ball v. Union Carbide*, 385 F.3d 713, 728 (6th Cir. 2004).

***No Common Questions Exist Even With Respect To Just Netflix, And Individualized Issues Predominate:*** Whether Netflix provides "video service" (if at all) in any particular city requires a city-specific investigation.  Whether Netflix's content is delivered over a particular city's public ROWs first requires knowing whether that city owns any public ROWs.  *See* Tex. Util. Code § 66.002(8) (a "public right-of-way" for purposes of the Act includes only those areas "in which a municipality has an interest").  ROWs in Texas can be owned by the State and not by local authority, and thus whether a particular ROW is owned by a proposed class member cannot be determined on a classwide basis.  *See, e.g.*, Lea Tr. 132:11-17; Texas Dep't of Transportation, *State Purchase of Right of Way*, https://ftp.dot.state.tx.us/pub/txdot-info/row/row-overview-white-paper.pdf; Tex. Transp. Code § 228.011(b-1) (referring to county use of "state highway right-of-way"); *id.* § 201.672(a) (referring to "state's right-of-way").

Even if all cities owned all public ROWs, individualized proof would still be needed to resolve numerous factual issues before the Court or jury could determine whether the public ROWs in a particular city are used to deliver Netflix content, as industry expert Mr. Steven Turner explains.  Turner Report ¶¶ 59-89.  Plaintiff's expert, Mr. Malfara, agrees that such a determination would require "further investigation" of several factors.  Malfara 4/29/21 Tr. 245:9-13; Malfara 6/8/21 Tr. 40:7-42:11.  ***First***, certain cities, especially in rural areas, do not

have broadband Internet access through wireline facilities, such that determining which cities have wireline facilities in their public ROWs through which content *could even potentially* be streamed requires individualized inquiry.  Malfara 4/29/21 Tr. 24:16-18; Malfara 6/8/21 Tr. 16:11-19:13, 20:6-23:9; Turner Report ¶ 61 (listing Texas cities without wireline broadband Internet).  As Mr. Malfara testified, this would require evaluating the "names of [ISPs]," "route maps of [ISPs]," and "logs of permits that were requested in order to construct facilities," Malfara 4/29/21 Tr. 109:8-17; *see also id.* at 187:7-20; 236:2-15; as well as conducting "a visual inspection of the network topology" for each ISP.  Malfara 6/8/21 Tr. 21:18-25:15, 40:7-43:11.

*Second*, even in cities where certain ISPs have wireline facilities in the city's ROWs, determining whether and to whom *those* ISPs deliver Netflix content *over those wireline facilities* would require individualized inquiries.  Plaintiff has not conducted this analysis (Lea Tr. 131:16-25; Simon Tr. 109:7-11, 111:20-23), but as Mr. Turner explains, there are more than 200 ISPs providing various types of service in Texas (e.g., mobile, satellite, and fixed wirelines as well as cable and fiber).  Turner Report ¶ 64.  All Texas cities are served by ISPs that offer satellite and/or mobile service untethered to wireline facilities in the city's public ROWs, and many are served by fixed wireless service as well.  Turner Report ¶¶ 64-75, Fig. 5, Ex. SET-C; Malfara 4/29/21 Tr. 143:3-149:5 ("direct satellite" and "[s]hort hop mobile" service may not use wires or cables in public ROWs); Malfara 6/8/21 Tr. 25:16-28:17.  If Netflix subscribers in those cities watch content over non-wired Internet connections, the Netflix service is not "video service," and determining who those subscribers are is a daunting task.  *See* Tex. Util. Code § 66.002(10).  Without city-specific investigation, for example, there is no way to determine if *any* of the public ROWs are being used in cities with a small number of Netflix subscribers. Malfara 4/29/21 Tr. 243:24-244:13; Malfara 6/8/21 Tr. 16:11-19:13.  At least 2,286 Texas zip

codes have fewer than 20 Netflix subscribers (by billing zip code), and individualized inquiries would be required to determine if any of those subscribers ever view Netflix content via an ISP that runs through a public ROW.  David Report ¶ 36 n.50.  Even in jurisdictions with a greater number of Netflix users, the Court or jury would need to determine the percentage of viewers watching content over a wired versus non-wired Internet connection, as the latter percentage is not receiving "video service" and revenue from those subscribers cannot be assessed a fee.

*Third*, "video service" does not include content provided by a commercial mobile service provider.  Tex. Util. Code § 66.002(10).  All Texas cities are served (at least in part) by ISPs that offer mobile service, and determining whether Netflix viewers in each city are streaming content over a mobile connection (and if so how many) would require an inquiry into the users of each city at any particular time.  Turner Report ¶¶ 64, 68-71, 84-85.

*Fourth*, many subscribers have access to both a wired Internet connection and a non-wired or mobile Internet connection.  Turner Report ¶¶ 60-75.  For those subscribers who sometimes watch content over a wired connection and sometimes over a non-wired or mobile connection, the Court or jury would need to determine the portion of content those subscribers watch over a non-wired or mobile network, as such service is not "video service."  It would then need to determine what portion of the subscriber's Netflix subscription fee is associated with the "video service" portion versus what portion is not.  That determination (if even possible) would vary by subscriber and then by each city's population, and it would also require some method of allocating portions of revenue (e.g., based on megabits streamed or hours viewed) that the Act does not contemplate or provide.  *See* Tex. Util. Code § 66.001, *et seq.*

*Fifth*, other exemptions may apply.  Certain rural ISPs may, for example, be classified as common carriers, and on-demand, interactive video service provided by those ISPs may be

exempt from franchise fees.  47 U.S.C. §§ 522(5), 522(7)(C); *Petition of NTCA*, Order, 33 FCC Rcd 5712 ¶ 4 (2018).  To the extent such ISPs are exempt from franchise fees, over-the-top services provided through such ISPs should necessarily be exempt as well.  It would require individualized inquiries to determine whether and to what extent Netflix content is delivered by these ISPs such that franchise fees could not and would not apply.  Turner Report ¶¶ 86-89.

*Sixth*, calculating damages is not as simple as applying a "statutory formula," as Plaintiff claims.  Mot. 16-17.  The statutory fee is applied against "all consideration . . . derived by the holder of a state-issued certificate of franchise authority from the operation of . . . the video service provider's network to provide . . . *video service* within the municipality."  Tex. Util. Code § 66.002(6)(A).  Because determining which residents (if any) in each city received video service (and, if so, in what proportion as compared to content that is *not* video service) would require subscriber-by-subscriber and city-by-city inquiry, assessing damages would as well.

*Seventh*, even if an appropriate damages model could be developed today, it would not apply either retrospectively to calculate past damages or prospectively to determine future fees. The availability and prevalence of wireless streaming (including 5G and satellite) has expanded over the past several years, and this expansion has occurred at varying rates in different municipalities.  Perryman Report ¶¶ 53-66.  To determine the gross revenues derived from providing "video service," the Court or jury would need to analyze not just each city's existing infrastructure and the use of wireless streaming in that city today, but also the mix of Internet usage in each city for each *prior* quarterly fee period.  That analysis cannot be done through any formula or on a classwide basis.  Any model that could be developed also would not be suitable to determine *future* fees, because the wireless options available in each municipality will continue to develop in a non-uniform manner into the future.  *Id.*  ¶¶ 53, 61-62, 64-66.

These individualized inquiries not only defeat commonality but also preclude certification under Rule 23(b)(2), because Netflix's conduct cannot be "enjoined or declared unlawful" "as to all the class members," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011), and "the proposed class lacks cohesiveness." *Stukenberg*, 675 F.3d at 847; *FPX, LLC v. Google, Inc.*, 276 F.R.D. 543, 550 (E.D. Tex. 2011). Calculating damages is also not "incidental" and "automatic," Mot. 16-17, and would entail "individualized determinations" incompatible with Rule 23(b)(2).[8] *See Allison v. Citgo Petroleum*, 151 F.3d 402, 415-17 (5th Cir. 1998); *Dukes*, 564 U.S. at 360-61.[9] Similarly, the individualized inquiries required to determine whether Netflix provides "video service" in each city and what Netflix's "gross revenues" are with respect to each city would predominate, defeating certification under Rule 23(b)(3). *Crutchfield*, 829 F.3d at 378.

Plaintiff fails to provide *any* trial plan, much less one that would allow for resolution of the core issues "without having the class devolve into a series of individual trials." *Verde v. Stoneridge, Inc.*, 2017 WL 2257172, at *1 (E.D. Tex. May 23, 2017) (Schroeder, J.); *see also Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 556 (5th Cir. 2011) (district court must consider "how a trial on the merits would be conducted if a class were certified"). The many city-specific issues described above would require this Court to engage in separate hearings and analyses with respect to each city, undermining any efficiencies potentially gained by class treatment.

---

[8] As explained further below (at 16-17), Plaintiff's claim that it has presented an "automatic" and "formulaic" method for calculating damages is also incorrect because its proposed approach does not correspond to the theory of liability set forth in its Complaint.

[9] While manageability and judicial economy are not standalone requirements for certification under 23(b)(2), those interests are protected by the requirement that injunctive relief predominate over any request for monetary relief. *Allison*, 151 F.3d at 414-15. The cases Plaintiff cites (at 15-16) are inapposite because each involved highly formulaic damages. *Gooch* did not involve a Rule 23(b)(2) damages class at all, and *Allison declined* to certify a Rule 23(b)(2) damages class.

**E.     Class Certification Is Improper Under Both Rule 23(b)(2) And Rule 23(b)(3) Given Additional City-Specific Defenses**

Netflix has a right to present its defenses to individual claims.  *Dukes*, 564 U.S. at 367. No municipality in Texas has ever notified or informed Netflix of any intent to collect a franchise fee from Netflix.  Mirkovski Decl. ¶ 3; Lea Tr. 35:17-36:11, 53:10-13.  The doctrines of laches, waiver, and estoppel prevent a city from: (1) knowing Netflix was providing service; (2) choosing to not seek a fee from Netflix or enforce an alleged right to a fee from Netflix; (3) thereby inducing Netflix to believe it was not subject to a fee and did not need to pass the fee on to its customers (Tex. Util. Code § 66.005(c)); and (4) then seeking to impose a fee years later when Netflix may no longer be able to pass it on to customers.  *See Tex. Utilities Fuel v. Marathon Oil,* 2000 WL 34234653, at *8 (Tex. App. Mar. 9, 2000).  Cities throughout Texas have had varying levels of knowledge of Netflix's service, as set forth in the attached Chart of Notice of Netflix (Ex. 3).[10]  The fact-intensive inquiries related to when each particular city had notice that Netflix was providing service, as well as the remaining elements of these and other defenses, defeat class certification.[11]  *FPX*, 276 F.R.D. at 550-53 (affirmative defenses defeated (b)(2) certification); *Cruson*, 954 F.3d at 256 (equitable defenses defeated predominance).

**F.     Class Certification Is Improper Under Rule 23(b)(3) For Additional Reasons**

**1.     Plaintiff's Damages Method Is Inconsistent With Its Liability Theory**

Plaintiff fails to present a damages model that "measure[s] only those damages attributable to [its liability] theory."  *Comcast*, 569 U.S. at 35.  Plaintiff alleges that Netflix owes

---

[10] San Antonio, for example, has banned employees from "streaming videos or media, such as Pandora, Netflix, and/or Google Video" since at least 2017.  Ex. 3 at 4 (citing Ex. 65 at 10).

[11] Netflix, for example, is also entitled to defend itself under the ITFA, the Dormant Commerce Clause, and the First Amendment based on the way each city characterizes, imposes, apportions, and earmarks its franchise fees.  *See* Mot. to Dismiss 15-21; *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977).

a percentage of gross revenues "***derived from . . . providing video service in that municipality***," Compl. ¶ 2, *see also id.* ¶¶ 19, 33, 39(e), which demands a damages model that determines the portion of Netflix's revenue associated with allegedly providing video programming through wireline facilities in a particular city's public ROWs and not via commercial mobile service. Tex. Util. Code § 66.002(6)(A).   Plaintiff, however, proposes a damages model based on Defendants' gross revenues "***derived from subscribers with service addresses*** *in each municipality*."  Mot. 19; *id.* at 5.  Plaintiff does not define "service addresses," and that term is not used in the Act.  But Plaintiff makes clear that its damages model turns on subscribers' physical addresses, "***regardless of*** whether Defendants' video programming is viewed by [city] residents outside the City, by non-residents inside the City, or by residents via mobile devices." *Id.* at 5.  Plaintiff's model is inconsistent with its liability theory as articulated in the Complaint because it does not turn only on gross revenues derived from "providing video service" in a particular city, David Report ¶¶ 31-33, and falls "far short of establishing that damages are capable of measurement on a classwide basis."  *Comcast*, 569 U.S. at 34.[12]

### 2.    A Class Action Is Not A Superior Method For Resolving This Dispute

***First***, the individualized inquiries related to liability and damages, combined with the conflicts among the class, present "manageability problems" which "detract[] from the superiority of the class action device."  *Allison*, 151 F.3d at 419; *see also Steering Comm. v. Exxon Mobil*, 461 F.3d 598, 605 (5th Cir. 2006).  As described above, this Court would have to sort through city-specific evidence, eviscerating any efficiency gained through class treatment.

---

[12] Plaintiff's model, for example, does not account for the fact that users can watch Netflix anywhere, in any amount, and can switch between wired and non-wired or mobile Internet connections.  Malfara 4/29/21 Tr. 90:20-93:7; Malfara 6/8/21 Tr. 33:24-34:12; Simon Tr. 159:13-19; Gorman Decl. ¶¶ 3-6; Smith Decl. ¶¶ 3-4, 14.  Viewing patterns also vary by user, by city, and over time, making it impossible to determine on a classwide basis whether Netflix's revenues for its streaming service relate to alleged "video service" in a particular city.  Turner Report ¶¶ 76-83; David Report ¶¶ 44-55; Perryman Report ¶¶ 53-66.

**Second**, class actions are designed "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights," *Amchem*, 521 U.S. at 617, but the "most compelling rationale for finding superiority in a class action—the existence of a negative value suit" (*i.e.*, a suit where the likely recovery is less than the cost of litigation) is absent here.  *Allison*, 151 F.3d at 420.  Each city in Texas (if it wants to impose fees on its residents) is motivated to pursue litigation itself, given the large amounts of money at stake.  And they may prefer to do so, rather than relinquish 25-33% of any recovery to Plaintiff's *counsel*, as often occurs in class actions.  *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 972 (E.D. Tex. 2000); Lea Tr. 48:18-21.

**Third**, each city may not agree with Plaintiff's attempt to expand the scope of the Act to apply to potentially every online video content provider (e.g., Amazon Prime, ESPN+, YouTube) that its residents use, thereby drastically increasing the fees its residents pay.  *See supra* at 4-7.  It is improper to permit the class vehicle to supplant each city's legislative function.

**Fourth**, it is improper to circumvent the Texas Legislature and expand the scope of the Act.  Netflix already pays millions of dollars in state sales tax, pursuant to a statute that expressly extends to "video on demand services or subscription services that allow purchasers to choose from a library of available content."  Texas Admin. Code § 3.313(a)(4); Mirkovski Decl. ¶ 4. Texas knew how to extend its statutes to services like Netflix, but chose not to do so with respect to the franchise fee.  New Boston should not be permitted to unilaterally overrule that judgment.

## III.     CONCLUSION

For all these reasons, Netflix respectfully requests the Court deny Plaintiff's Motion for Class Certification.

Dated: June 21, 2021

Respectfully submitted,

*/s/ Jennifer H. Doan*

Jennifer H. Doan
Texas Bar No. 08809050
Cole Alan Riddell
Texas Bar No. 24105423
HALTOM & DOAN
6500 Summerhill Road
Crown Executive Center Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile: (903) 255-0800
Email: jdoan@haltomdoan.com
Email: criddell@haltomdoan.com

**LATHAM & WATKINS LLP**
Mary Rose Alexander
California Bar No. 143899
Robert C. Collins III (pro hac vice)
Illinois Bar No. 6304674
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: mary.rose.alexander@lw.com
Email: robert.collins@lw.com

Jean A. Pawlow (pro hac vice)
D.C. Bar No. 421782
555 Eleventh Street, N.W. Suite 1000
Washington, DC 20004
Telephone: (202) 637-3331
Facsimile: (202) 637-2201
Email: jean.pawlow@lw.com

**ATTORNEYS FOR DEFENDANT
NETFLIX, INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on June 21, 2021, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/ Jennifer H. Doan*
Jennifer H. Doan
