# EXHIBIT 15

```
 1                 UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3    ----------------------------|

      CITY OF MAPLE HEIGHTS, OHIO, |

 4    individually and on behalf of|

      all others similarly         | Case No. 1:20-cv-01872

 5    situated,                     |

                                    |

 6       Plaintiffs,                | JUDGE JAMES S. GWIN

                                    |

 7    vs.                           |

                                    | MAGISTRATE JUDGE

 8    NETFLIX, INC., and HULU, LLC, | THOMAS M. PARKER

                                    |

 9       Defendants.                |

      ----------------------------|

10

11                         - - -

12                 Thursday, April 29, 2021

13                         - - -

14          This is the Remote Videotaped Deposition of

15    DAVID MALFARA, commencing at 9:04 a.m. Eastern Time,

16    on the above date, before Susan D. Wasilewski,

17    Registered Professional Reporter, Certified Realtime

18    Reporter, Certified Manager of Reporting Services,

19    Certified Realtime Captioner, and Florida

20    Professional Reporter.

21                         - - -

22                 GOLKOW LITIGATION SERVICES

23           877.370.3377 ph | 917.591.5672 fax

24                    deps@golkow.com

25
```

```
 1   efforts to bring affordable broadband service to

 2   rural America.

 3        Do you see that?

 4   A.   That's correct, yes.

 5   Q.   What do you mean by the phrase "to bring

 6   affordable broadband service to rural America"?

 7   A.   Do we have a week?  In a nutshell, it is the

 8   ability to produce designs that are optimized to

 9   reduce cost and still provide a networking -- a

10   broadband infrastructure that supports not only end

11   user access to the Internet, but also spurs economic

12   growth in the area.

13   Q.   So are there areas of rural America that do

14   not have broadband Internet access?

15   A.   Most certainly.

16   Q.   Are there areas of rural America in Ohio

17   that do not have broadband Internet access?

18   A.   According to the FCC, yes.

19   Q.   Do you know where those areas are?

20   A.   I couldn't give you the census block groups

21   right now but you would only have to go to the FCC's

22   RDOF program Phase 1 and they have a map for that,

23   yes.

24   Q.   Does that mean that those areas cannot

25   currently watch Netflix content?
```

David Maffara

```
 1    facilities.  So any manner of Layer 1 facility could

 2    be used to provide that service.

 3       Q.   And when you say "fixed wireless," what do

 4    you mean?

 5       A.   Fixed wireless, it's a -- you know, it is a

 6    technology that uses radios that exist in a

 7    subscriber area, commonly called subscriber modules,

 8    that interface to an access point, which may be on a

 9    tower or, you know, in some other location that's

10    easily seen, line of sight by the subscriber home,

11    and then that Internet connection is backhauled

12    usually by terrestrial wire line facilities back to

13    a common aggregation point, at which time

14    interconnection is done to an IP transit service or

15    something like that to a Tier 1 Internet service

16    provider.

17       Q.   So do fixed wireless -- does fixed wireless

18    Internet technology always use, like, wires and

19    cables in the right-of-way?

20       A.   I would say, you know, much more than 90

21    percent of the time, yes, because --

22       Q.   When did it not?

23       A.   If they use wireless backhaul, which is very

24    infrequent, and simply done typically for short

25    distances, to get to a location that actually does
```

David Maffara

```
 1    have a wire line interconnection.
 2        Q.   Do you know if there are any fixed wireless
 3    technologies that use wireless backhaul in Ohio
 4    without the wires or cables in the right-of-way?
 5             MR. HAWAL:  Objection; form.
 6        A.   Oh, no, I simply wouldn't know.
 7        Q.   And then before Remi Communications you were
 8    with Z-TEL Network Services, Inc.; is that right?
 9        A.   That's correct.
10        Q.   And you were the President of Z-TEL Network
11    Services, Inc., from October 1998 through January
12    2001?
13        A.   That's correct.
14        Q.   And what was Z-TEL Network Services, Inc.?
15        A.   Z-TEL Network Services, Inc., was the
16    operating subsidiary of Z-TEL as it pertains to
17    local exchange carrier operations under the newly
18    enacted Telecommunications Act at that time, and
19    began to provide Internet service as well through
20    interconnection to other Internet service providers
21    through resale agreements.
22        Q.   And what was your role in terms of your job
23    responsibilities with Z-TEL Network Services?
24        A.   I created the business case for it, and
25    then built the operational organizations that would
```

David Malfara

```
 1    some accounts where you can have multiple users.
 2        A.   Okay.
 3        Q.   So you've watched Netflix content then?
 4        A.   I have.
 5        Q.   Where have you watched Netflix content?
 6        A.   Downstairs in my home.
 7        Q.   Any -- have you watched it on your account
 8    anywhere else?
 9        A.   I believe, actually, because my mother is
10    from Ohio, Marblehead, Ohio, I believe I have used
11    that account in Marblehead, Ohio, yeah, to watch it
12    on her TV.
13        Q.   So -- and you don't have to give me the
14    exact numbers, but where is your residential
15    address?  Is it in Florida?
16        A.   Yes.
17        Q.   And you've watched Netflix content on your
18    account at your mother's house in Ohio?
19        A.   Yes.
20        Q.   Have you watched it anywhere else, in any
21    other cities or states?
22        A.   Not that I recall.  We all don't travel much
23    right now, right?
24        Q.   Sure.
25        A.   But, yeah, not that I recall.
```

David Maffara

```
 1        Q.   When you watched Netflix content on your

 2   account in Ohio, over what type of Internet service

 3   did you watch it?

 4        A.   Spectrum's wire line service, yeah.

 5        Q.   And who is the subscriber on that Internet

 6   account?

 7        A.   My mother.

 8        Q.   What other types of Internet service

 9   provider connections have you watched Netflix

10   content?

11             MR. HAWAL:  Objection; form.

12        A.   Meaning?

13        Q.   Fiber, satellite, mobile?

14        A.   I'm a relatively boring user.  I've only

15   used it really in those two locations.  I don't

16   watch a great deal of television, yeah.

17        Q.   Could you watch Netflix content over your

18   cell phone mobile connection?

19             MR. HAWAL:  Objection; calls for

20        speculation.

21        A.   My understanding is I could.

22        Q.   Can you watch Netflix content over a

23   Internet service connection provided by a satellite

24   service?

25             MR. HAWAL:  Objection; calls for
```

David Maffara

```
 1    of what layer are we talking about, right?  You

 2    know, if we're talking about the application layer,

 3    then yes, absolutely, Netflix directly provides that

 4    to me because you're the one that acquires the

 5    content itself and uses whatever mechanisms you've

 6    arranged contractually or otherwise to make that

 7    content possible for me to view.

 8         That's what the subscription price is for,

 9    right?  As a user, not as an expert, just a user, I

10    pay Netflix and you deliver content to me.

11    Q.   Does Netflix have any facilities or

12    infrastructure to be able to deliver that content to

13    your TV in your house?

14    A.   My understanding --

15         MR. HAWAL:  Objection.

16    A.   -- according to your, you know, open connect

17    document is that you do.

18    Q.   Really?  What is it?

19    A.   The OCA.

20    Q.   The OCA by itself can deliver content to

21    your house?

22    A.   I have no idea because we haven't gone

23    through that detail, so, you know, the very general

24    statements made within the context of that document

25    mean that further discovery is required to really
```

David Maffara

```
 1    find out, yeah.

 2       Q.   Okay.  So you don't know sitting here today?

 3       A.   No.

 4       Q.   Do you know whether Netflix makes content

 5    recommendations that are personalized to the user?

 6       A.   Speaking as a user and not an expert, I can

 7    tell you that I believe they do, yes.

 8       Q.   Are you opining on the meaning of video

 9    programming?

10       A.   No.

11       Q.   Are you aware of the phrase video -- let me

12    start that over.

13            Are you aware that "video programming" is a

14    phrase in the Ohio Video Service Authorization law?

15       A.   I have seen the definition for video

16    programming but I don't have an opinion as to the

17    context or use of that phrase, to do anything than

18    a, you know, a user of your service would state.

19       Q.   Okay.  So you're not opining on the meaning

20    of video programming in the Ohio Video Service

21    Authorization law or the Maple Heights ordinance or

22    federal law?

23       A.   Correct.

24       Q.   Are you opining on the meaning of franchise?

25       A.   No.
```

David Malfara

```
 1      A.   It's not a yes-or-no question.  I want to be
 2   responsive, Robert, but I can't make a statement
 3   that can be taken out of context in different ways.
 4   I have no idea without elaboration what you are
 5   actually asking me.
 6      Q.   I think it is a pretty straightforward
 7   question.
 8           Are you, as an expert, are you testifying as
 9   an expert in this case that -- sitting here today
10   with what you know now, that Netflix provides video
11   programming?
12           MR. HAWAL:  Objection.
13      A.   And as an expert I will answer you that it
14   is not a clear-cut question.
15      Q.   Because?
16      A.   Because there are technological influences
17   that could make the answer to that question in
18   opposite ways.
19      Q.   Okay.  So sitting here today, do you know
20   whether or not Netflix provides video programming?
21           MR. HAWAL:  Objection; asked and answered.
22      Q.   You can answer the question.
23      A.   Well, no, that's the same question.
24      Q.   It's not because it's do you know.
25           Do you know sitting here today whether or
```

David Malfara

```
 1    not Netflix provides video programming?

 2        A.   Do I know?  No.

 3        Q.   Okay.  And because you don't know, you are

 4    not testifying today that Netflix provides video

 5    programming, correct?

 6        A.   With the information available to me in

 7    discovery, I'm not today stating that in any sense

 8    other than a generic sense that I would have as an

 9    understanding based on my use of the service, and

10    certainly as an expert.

11             The term "video programming" is a, you know,

12    is an ambiguous reference.  I have used it, I have

13    used the term in a generic sense, and that is, as

14    I've said, as a user or as a technology expert, but

15    it's still a generic reference.

16             What would you have me call it, Robert?

17        Q.   It's such a simple question.  If you don't

18    know -- you've already testified you don't know

19    whether or not Netflix provides video programming

20    sitting here today.  So based on your lack of

21    knowledge, you can't be testifying today that

22    Netflix provides video programming, correct?

23             MR. HAWAL:  Objection; form.

24        A.   If you ask me if Netflix provides video

25    programming as I understand as a user, I would say
```

David Malfara

```
 1    users can stream Netflix content on a variety of
 2    personal devices connected to broadband Internet?
 3        A.   Yes.
 4        Q.   Would you agree that there is no requirement
 5    that a Netflix user watch Netflix content at a
 6    particular location?
 7        A.   Unknown.
 8        Q.   What do you mean?
 9        A.   Without further information about those
10    rules, I simply don't know.  You know, I'll use an
11    example of, for instance, what you do to limit
12    whatever you want to call what you produce, okay, in
13    being visible in different countries because of
14    different rules.  There are, as, again, just a user,
15    there are regional rules with regard to certain
16    content that I know content providers or content
17    creators put in place, and I've got no idea at this
18    point in time of whether or not any of those are
19    applicable to Netflix.
20        Q.   Okay.  Let's focus on Ohio then.  So is
21    there any requirement that a resident of Ohio who
22    subscribes to Netflix watch Netflix content at a
23    particular address in Ohio versus somewhere else in
24    Ohio?
25             MR. HAWAL:  Objection.
```

David Malfara

1    A.   I don't believe so.

2    Q.   You don't believe there is such a

3    requirement?

4    A.   Correct.

5    Q.   Is there any requirement -- let me try that

6    again.

7         Is there any restriction against a Ohio

8    resident with a Netflix account -- let me -- bad

9    question.

10        If an Ohio resident has a Netflix

11   subscription, can they watch their Netflix content

12   in Kentucky or Indiana?

13   A.   I believe so.

14        MR. HAWAL:  Objection.

15   Q.   So to your knowledge, a Netflix customer can

16   watch content in different parts of the United

17   States?

18   A.   I believe that to be true.

19   Q.   An Ohio customer -- let me start --

20        A Netflix customer in Ohio is not restricted

21   to only watching Netflix content at a particular

22   residential address in Ohio, correct?

23   A.   I believe that to be true.

24        MR. HAWAL:  Objection.

25   A.   Yeah.

1      Q.    For example, if I reside in Toledo and I

2    have a Netflix account, I can watch Netflix in

3    Cleveland or Cincinnati or other cities in Ohio,

4    right?

5      A.    Yes.   That is what I meant, yes.

6      Q.    And if you watch Netflix content in some

7    other city or state, you will be watching it through

8    a different Internet connection, correct?

9      A.    Yes.

10     Q.    So there's no requirement that a Netflix

11   customer always watch content at the exact same

12   address?

13     A.    Yes, there is not, to my knowledge.

14     Q.    And there's -- and there's no requirement

15   that a Netflix customer always watch Netflix content

16   at the same location, right?

17           MR. HAWAL:  Objection; asked and answered.

18     A.    Yes, that's correct.  I -- yeah.

19     Q.    There's no requirement that a Netflix

20   customer always watch content in the same ZIP code,

21   right?

22     A.    I believe I've answered that.  Yes, that's

23   correct.

24     Q.    There's no requirement that a Netflix

25   customer always watch content in the same county?

```
1      A.   Yes.

2      Q.   That's correct?

3      A.   That's correct.

4      Q.   And it is correct that there is no

5  requirement that a Netflix customer always watch

6  content in the same state?

7      A.   Yes.

8      Q.   Is it possible that a Netflix customer could

9  have a residential address in one location but watch

10  all of their Netflix content at a different

11  location?

12          MR. HAWAL:  Objection; calls for

13    speculation.

14      A.   Without further discovery, I could not

15  answer that question, you know, on an informed

16  basis.  I may believe that to be true, but again,

17  you know, that answer is subject to further

18  discovery, frankly.

19      Q.   Fair enough, but you've already testified

20  that a Netflix user can watch content in different

21  cities and different states.

22      A.   I have.

23      Q.   So if -- so if a Netflix customer for -- for

24  governmental purposes they have their residence --

25  let me start that over.
```

David Malfara

```
 1    again, this is without discovery, I'm trying to

 2    expand and give you an opinion here.  You know, I

 3    would assume that the content is encrypted, you

 4    know, and so whether it is a physical device or an

 5    application executed by a, you know, by a processor

 6    that is required.  You know, you talk about

 7    physicality, it's just -- you know, there is a

 8    difference between, for example, a smart TV and a

 9    dumb TV.  Right?  Hulu content cannot be viewed on a

10    dumb TV, to my knowledge, but it can be viewed on a

11    smart TV.

12          Well, what's the difference between those

13    two?  It's hardware, you know, it's physical

14    hardware.

15    Q.   I want you to maybe listen to my question,

16    though.

17    A.   Okay.

18    Q.   A sub -- a Netflix subscriber does not need

19    any physical equipment from Netflix to watch Netflix

20    content?

21    A.   That's correct.  I apologize.

22    Q.   Netflix does not provide any physical

23    equipment to its customers, correct?

24    A.   To my knowledge, no.

25    Q.   Netflix does not provide in-person services
```

1    to its customers, like repair services or

2    maintenance services, right?

3        A.   To my knowledge, no.

4             MR. HAWAL:  Objection; form.

5        Q.   Do you know, in your area of expertise, in

6    your knowledge and experience, do you know what a

7    service address is?

8             MR. HAWAL:  Objection; calls for a legal

9         conclusion.

10       A.   Yeah.

11       Q.   I'm not asking for a legal opinion.  I'm

12   asking in your area of expertise, you know, as a

13   telecommunications professional for 40 years, do you

14   know what a service address is?  Is that a phrase

15   you've heard?

16       A.   It is a phrase with an ambiguous definition,

17   yeah.  So to give you a definitive definition of the

18   term "service location," I could not, no.

19            And to expand on that a little bit, again,

20   bringing our friend the OSI reference model into the

21   picture, you know, could be different basically at

22   the different layers, so --

23       Q.   In your -- in your profession, in your work,

24   do you use the phrase "service address"?

25       A.   Rarely.

```
 1              MR. HAWAL:  Objection; asked and answered.
 2      Q.   When -- you said rarely.  When have you used
 3   it?
 4      A.   Well, I say rarely because the term itself
 5   is ambiguous in my industry.  You know, you --
 6      Q.   You said you have used it rarely.  When have
 7   you used it?
 8      A.   To talk about at different -- at different
 9   layers of the OSI reference model, the termination
10   of that physical or logical construct.  Okay?  So a
11   label switch path, for example, in an MPLS routing
12   domain might have a service address of a core
13   router, and, you know, another -- the other end of
14   that might be at a penultimate router.  So, you
15   know, those might be the service locations,
16   specifically an interface, for example.
17              So I've used those in that -- in that
18   context.
19              Provider broadcast -- or provider backbone
20   bridging, for example, has a VLSI, which is a
21   reference to a service port or a service location.
22              So it just -- it really depends.  Our
23   industry is almost completely based on context.
24      Q.   So is a service address where the service at
25   issue is being provided?
```

1       A.   A service address in general is where a
2   service is being consumed, and that --
3       Q.   Okay.  So --
4       A.   -- and that "where" can be a nonphysical or
5   a physical location.  Okay?  So it can be a label
6   switch path, for example, in my previous example.
7   Well, where is a label switch path?  You can't
8   define it physically.
9       Q.   Okay.  So a service address -- I believe you
10  said a service address is where the content is being
11  consumed.  Can you give me an example of that?
12      A.   Yeah, an identified location that
13  participates, and again, you know, when we get into
14  technology and relative indexing of terms, you know,
15  where a -- if that's a VLAN, for example, it could
16  be consumed across a bridging domain which actually
17  has in it many, many different what we call
18  endpoints.  Okay?
19           So, you know, so it just really is
20  relatively indexed.  I can't give you a, you know, a
21  proper definition for the term service location
22  because there isn't one in my world.  Okay?
23      Q.   Okay.  So let me -- let me -- I'm really
24  honestly trying to understand, right, your world,
25  so -- because it is complicated.

```
1              So in the context of, like, a landline

2    telephone that comes to my house, is there a service

3    address in that context?

4         A.   Yes.

5         Q.   What is it?

6         A.   Under, you know, under Class 5 rules of, you

7    know, telecommunications, the public switch

8    telephone network terminates a subscriber line at a

9    service location, and that service location --

10        Q.   So it's where the --

11        A.   -- is the endpoint of that physical line,

12   but that's specifically within the context of the

13   public switch telephone network.

14        Q.   Okay.  What about in the context of

15   traditional cable service, is there a service

16   address?

17        A.   There would be a service address, to my

18   understanding, that may be a physical location.

19   That is a location -- you know, I'm -- I'm going

20   back and forth here because of, you know, smart

21   services offered by Comcast, for example, right now,

22   things of that sort.

23              Typically, to my understanding, it is the

24   location of the service that, for example, the bill

25   is sent to.  Okay?  That's as closely as I could
```

David Malfara

```
 1    physical address of the subscriber.  You know, that
 2    for me is Florida; that for my mother is, you know,
 3    Marblehead, although she doesn't subscribe to
 4    Netflix.
 5            You know, the scenario is that you're saying
 6    where the service is consumed.  I don't believe that
 7    is an identifier for service location when you are
 8    talking about an account-based reference to that --
 9    to that subscriber.  You know, we call them
10    subscribers because they subscribe.  Right?  And
11    they have a physical location that is a permanent
12    location, and that's how I think of it, but that's
13    not a legal opinion.
14            I don't have an opinion within the context
15    of Ohio law of whether or not that, you know, that
16    resolves correctly.
17    Q.    Okay.  So maybe I should -- are you offering
18    -- because I think maybe I heard you say it, maybe I
19    didn't.
20            Are you offering an opinion in this case, at
21    least at that point, as to what service address
22    means?
23    A.    No, not at this point.
24    Q.    From any perspective, whether in the statute
25    or from your experience?
```

1    packets of information as discerned by the ISP.

2    Yeah.

3        Q.   Yeah, and I didn't ask what your subscriber

4    address is.  I was asking your service address,

5    so --

6        A.   And I don't know the difference is what I

7    can say right now.

8        Q.   Okay.

9        A.   Because that calls for context.  Yeah.

10       Q.   Okay.  But when you're watching Netflix

11   content at your mother's house, where are you

12   receiving service?

13           MR. HAWAL:  Objection; form.

14       A.   Yeah.  I mean, you know, I'm receiving the

15   content at my mother's house.  I feel that you're

16   putting, you know, an implication on the use of the

17   word "service" that I'm not prepared to, you know,

18   to give.

19       Q.   Okay.  You're not offering an opinion today

20   on it?

21       A.   Right.

22       Q.   So maybe we can just stop there.

23       A.   Okay.

24       Q.   Are you offering any opinions regarding

25   determining where a customer is watching Netflix

1    content?

2        A.   No, I don't believe I have.

3        Q.   Are you -- are you offering any opinions on

4    whether it's possible to determine where a customer

5    is watching Netflix content?

6        A.   Not at this time.

7        Q.   Are you offering any opinions on the

8    accuracy of any methods to try to locate where a

9    customer is watching Netflix content?

10        A.   Not at this time.

11        Q.   Do you have expertise regarding the accuracy

12    of trying to determine where a customer is viewing

13    content?

14        A.   Yes.

15        Q.   What's your expertise?

16        A.   My expertise is in using the technology

17    interconnections and the availability of that

18    information to determine where a subscriber is

19    regardless of whether they are a wire line or a

20    wireless subscriber.

21        Q.   And what's your -- how accurate is that

22    information?

23        A.   Pretty darn accurate.  You know, with wire

24    line technology, it's relatively easy.  With

25    wireless technology, using triangulation, using, you

David Malfara

```
 1              MR. HAWAL:  Objection.

 2     A.    Yeah.

 3     Q.    You don't know?

 4     A.    I have no idea.

 5     Q.    Do you know whether Netflix operates any

 6  facilities in the public right-of-way in Ohio?

 7     A.    I do not know.

 8     Q.    Do you know whether Netflix has constructed

 9  any facilities in the public right-of-way in Ohio?

10     A.    I don't know at this point.

11     Q.    Do you know whether Netflix controls any of

12  the facilities in the public right-of-way in Ohio?

13     A.    Could you define the word "controls"?

14     Q.    How would you define it?

15     A.    Influencing the operation of.

16     Q.    Do you know whether Netflix influences the

17  operations of any facilities in the public

18  right-of-way in Ohio?

19     A.    Not definitively.

20     Q.    You don't know?

21     A.    I don't know at this time.

22     Q.    Have you ever testified on the location

23  accuracy of how to identify the location of a

24  customer using IP information?

25     A.    Well, I didn't necessarily say I was going
```

David Malfara

```
 1    to use IP information, but no, I have not, that I

 2    recall.

 3        Q.   What information would you use?

 4        A.   Unknown at this time.  It requires responses

 5    to discovery to determine.

 6        Q.   Is location information based on IP

 7    information accurate?

 8        A.   At Layer 3, but IP information, as you well

 9    know, is not exact.  IP addresses can be spoofed,

10    you know, a number of different things.  It's harder

11    to spoof a MAC address, a media access control

12    address.  It's even harder to spoof a XGS-PON

13    identifier on a optical fiber optical passive

14    network.

15         You know, so there is a number of different

16    ways to determine location that are well outside a

17    Layer 3 identification of the network, yeah.

18        Q.   Okay.  But can you use information

19    associated with an IP address to accurately pinpoint

20    the location where someone is streaming content?

21        A.   No, not on a, you know, 100 percent

22    validated basis, no, absolutely not.

23        Q.   Does Netflix use any facilities in the

24    public rights-of-way in Ohio?

25        A.   I don't know.
```

David Malfara

```
1            MR. HAWAL:  Objection.

2       Q.   Does Netflix access any facilities in the

3   public rights-of-way in Ohio?

4            MR. HAWAL:  Objection; form.

5       A.   Again, to answer your question, I need to

6   have more information in discovery.

7       Q.   That's fair, and that's fair, so maybe let

8   me ask it this way.  What information would you need

9   in order to say that Netflix does use facilities in

10   the public right-of-way in Ohio?

11       A.   You know, just -- I can't tell you

12   definitively but I would tell you what would be

13   included in that would be names of Internet service

14   providers, route maps of Internet service providers,

15   you know, logs of permits that were requested in

16   order to construct facilities, things of that

17   nature.

18       Q.   Okay.  So hypothetically speaking, right, if

19   Netflix does not have any physical infrastructure in

20   the public right-of-way and an open connect

21   appliance is on private property of some kind, and

22   the Internet service provider delivers the content

23   from the open connect appliance to the Netflix

24   customer wanting to stream content, in that scenario

25   is Netflix using the public right-of-way?
```

David Malfara

1    Q.    -- server on private property --

2    A.    Yes.

3    Q.    -- and Netflix does not own or operate any

4    of the wires or cables that belong to the Internet

5    service provider, what, in your view, is Netflix's

6    involvement in the delivery of that content?

7    A.    You're a control layer at AWS.

8    Q.    Okay.  But once the content is

9    transmitted -- is being transmitted from the OCA to

10   the Internet service provider -- I'm sorry.  Once

11   the content is being transmitted from the open

12   connect appliance to the customer, does Netflix have

13   any role in the actual transmission from the OCA to

14   the customer over that wire or cable?

15        MR. HAWAL:  Objection.

16   A.    Unknown even in your hypothetical.  Okay?

17   Because I'm not sure under what conditions network

18   behavior -- which your document does state

19   influences what you do with delivery of content.  I

20   just don't know.

21   Q.    Okay.  So right now you don't know?

22   A.    Correct.

23   Q.    Do you know whether it's possible for a

24   customer in Ohio to be receiving Netflix content

25   from an open connect appliance in a different state?

```
 1              And that's what I mean, that -- and how they
 2    convey that information could be very easily, and
 3    often is, within the context of what's called a
 4    virtual private network connection that they
 5    establish between two locations, and a virtual
 6    private network is not the Internet.  The public
 7    Internet is a public network.  Right?  Where free
 8    access is available to any routable address.
 9              That's as close as I can come to a
10    definition, right, of how I use the terms.  Whether
11    or not that holds up in other venues or in other
12    contexts, you know, is not known to me but when I
13    refer to it, that's what I mean.
14    Q.   So do you know whether Netflix content is
15    delivered to customers over that last mile over the
16    public Internet?
17    A.   I don't know that today.
18         MR. HAWAL:  Objection.
19    A.   Yeah.
20    Q.   Okay.  So you don't know that today?
21    A.   Correct.
22    Q.   What would impact your opinion?  Under what
23    circumstances would you say that Netflix content is
24    being delivered over that last mile over the public
25    Internet?
```

1    make sure I heard you.

2           I understood you said that in that first

3    sentence of Paragraph 14, the methods and physical

4    routing relate to each other and right now you don't

5    know what the methods and physical routing are for

6    Hulu and Netflix subscription content; is that

7    right?

8    A.   Yes.  The methods would pertain to, for lack

9    of a different term, the protocol to use in routing

10   and in transmission of the content, and then the

11   paths, of course, are the physical paths that would

12   be transited by the content.

13   Q.   Okay.  And you don't know what those are

14   right now?

15   A.   No.  We've not gone through the Q & A to

16   determine that for you.

17   Q.   What do you mean Q & A?  With me?

18   A.   Discovery.

19   Q.   Okay.  Okay.  All right.  So then in the

20   next portion of Paragraph 14 you say:  All of my

21   opinions herein apply equally to transmission of

22   Hulu and Netflix subscription-oriented video

23   programming to subscribers located in all

24   municipalities and counties in the state of Ohio, as

25   well as nationwide.

1          Do you see that?

2     A.   Yes.

3     Q.   What do you mean by they apply equally?

4     A.   They are consistent.  In other words, there

5     is nothing that would -- that would differentiate

6     one area from the other in terms of the application

7     of what I say in my report.

8     Q.   Okay.  But if you currently don't know the

9     methods and physical routing for Hulu and Netflix

10    content respectively, how can you say your opinions

11    apply equally?

12    A.   Well, because I have no reason to determine

13    the contrary and I reserve the right to modify this

14    report based on information I would learn in

15    discovery.

16    Q.   Okay.  So can you say today that they apply

17    equally or does it depend on the discovery that

18    you're looking for?

19    A.   No, I believe I can say they apply equally

20    because information to the contrary would be outside

21    of the information that I do have from Hulu and

22    Netflix.

23    Q.   Do Hulu and Netflix use the same servers in

24    connection with their content that's delivered?

25    A.   No, I understand that not to be the case.  I

David Malfara

1    don't know that that's in totality but I believe

2    that they are mutually exclusive in all cases, yes.

3        Q.   Okay.  Hulu and Netflix are independent

4    companies?

5        A.   Yes.  Understood.

6        Q.   Do Hulu -- do Hulu and Netflix negotiate, if

7    at all, the same arrangements with Internet service

8    providers?

9             MR. HAWAL:  Objection; form.

10       A.   Yeah, I don't -- I don't understand the

11   question within this context.

12       Q.   Okay.  Let me ask, how do Hulu and

13   Netflix -- well, let me -- let me start that over.

14            Do Hulu and Netflix have the same content,

15   video content?

16            MR. HAWAL:  Objection; form.

17       A.   I believe not.

18       Q.   Are Hulu and Netflix content transmitted in

19   the same way?

20            MR. HAWAL:  Objection; form.

21       A.   Unknown.  Yeah.

22       Q.   You said unknown?

23       A.   Correct.

24       Q.   Okay.

25       A.   You know, it's --

David Maffara

```
 1        A.   Oh, yes.  I'm sorry.  Yes, I can.  They are

 2   press releases and, in fact, they are cited in my

 3   report, at least for Hulu.

 4        Q.   Okay.

 5        A.   I don't believe -- I'm not sure for Netflix

 6   but my opinion is it wouldn't take five minutes on

 7   Google to see that that has been, you know,

 8   publicized by CDMs in the past.

 9        Q.   But you didn't bother to do that in

10   connection with your report, right, the five minutes

11   on Google?

12             MR. HAWAL:  Objection; form.

13        A.   In connection -- in connection with Netflix,

14   I did not, because Netflix now professes that they

15   transmit their service through their own CDN.

16        Q.   Okay.  So that's a difference between Hulu

17   and Netflix?

18        A.   That's correct.

19        Q.   Do your opinions apply equally to the

20   transmission of video content to subscribers by

21   other subscription-oriented services?

22        A.   I couldn't speculate at this point in time.

23   It really does require information that I would need

24   to be privy to to make that representation.

25        Q.   So if I asked you about Amazon Prime Video,
```

1    Q.   Okay.  So when you say that in Paragraph 15,

2    you're relying on definitions from the FCC?

3    A.   I'm relying on generally understood

4    conveyances from entities as various as the FCC or

5    IEEE, which I'm a member of, or NCIA, or other

6    organizations who collectively refer to the

7    broadband industry as the conveyance that's most

8    articulately described by the FCC definition.

9    Q.   Okay.  If you look at the last sentence of

10   Paragraph 15, you say:  All such wire line methods

11   of content delivery rely on transmission of

12   high-speed data over publicly owned rights-of-way.

13        Do you see that?

14   A.   Yes.

15   Q.   What did you do to reach the conclusion that

16   all such wire line methods of content delivery rely

17   on transmission of high-speed data over publicly

18   owned rights-of-way?

19   A.   In 45 years of activity in this -- in this

20   industry, I've never seen anything that was contrary

21   to that statement.

22   Q.   What did you do to determine that all wire

23   line methods of content delivery in Ohio rely on

24   transmission of high-speed data over publicly owned

25   rights-of-way?

1    A.   Again, the same answer.  You know, the

2    engineering design of networks does not change -- do

3    not change at the state border.  When a -- when an

4    ISP or a large carrier designs a network, and I've

5    designed several, you know, we use the same network

6    topology regardless of where we place it, unless,

7    you know, there are reasons based on the topography

8    that would preclude that.

9         And in general, Ohio is quite typical of

10   states in the Midwest in terms of the amount of

11   rural, the amount of urban areas, and so the network

12   design would essentially be the same.  Now, that's

13   at Layer 1.  Okay?

14        At Layer 3 it's even more important that

15   that -- that those rules extend throughout a network

16   that would subsume Ohio and its operation but isn't

17   isolated to Ohio.

18   Q.   But you can't tell me who the Internet

19   service providers are in Ohio right now, right?

20   A.   Well, I can tell you two of them right now.

21   I can tell you Verizon and AT&T, and I can tell you

22   Spectrum specifically, but that doesn't matter.  It

23   doesn't matter who the provider is, it matters

24   realistically what the accepted network topology is

25   for a carrier that provides a Layer 3 service called

David Malfara

```
1    Internet.  The rules that comprise the definition of

2    Internet are what comprises it in totality.  There

3    is no --

4        Q.   Let me ask you this --

5        A.   Yeah.

6        Q.   Are you aware as to whether or not there are

7    any wire line methods of content delivery in Ohio

8    that rely on transmission of high-speed data over

9    private land as opposed to publicly owned

10   rights-of-way?

11       A.   At this time I do not, but I can tell you

12   that the probability is that more than 90 percent of

13   those networks, in my experience, do contain fiber

14   or other cable that transits public right-of-way.

15       Q.   All right.  But you don't know either way in

16   Ohio as you sit here today?

17            MR. HAWAL:  Objection; asked and answered.

18       A.   That's correct, not without -- not without

19   additional discovery.

20       Q.   Okay.  And yet you're sitting here and

21   you're opining that all such wire line methods rely

22   on content delivery over publicly owned

23   rights-of-way, that's still your testimony?

24       A.   Well, that is my testimony, yes.

25       Q.   Even though you just said you don't know?
```

1          MR. HAWAL:  Objection; misstates testimony.

2     A.   Yeah.  Yeah.  I would --

3     Q.   Okay.  If that's your testimony --

4     A.   Yeah, that's my testimony.

5     Q.   Okay.  If that's your testimony, that's your

6     testimony.

7     A.   Yep.

8     Q.   If we remove the phrase all -- if we remove

9     the phrase "such wire line," so take out the phrase

10    "such wire line" from your sentence, and I asked you

11    whether the following statement is true:  All

12    methods of content delivery rely on transmission of

13    high-speed data over publicly owned rights-of-way,

14    would you agree or disagree?

15    A.   Disagree.

16    Q.   Because?

17    A.   Because facilities that require

18    rights-of-way are a subset, although the predominant

19    medium over which its content is transmitted.  So

20    if, you know, .5 percent of transmission occurs over

21    Elon Musk's, you know, Starlink system, that's fine.

22    That keeps me from saying "all," but statistically,

23    it is on, you know, significantly less than the

24    predominant nature of routes and transmission paths

25    of physical networks that also include wireless

1    services, either fixed wireless or cellular, because

2    of backhaul.

3        Q.   Okay.  So I just want to make -- I

4    appreciate the clarification.  So you disagree.  And

5    so what are the types of methods of content delivery

6    that do not rely on transmission of high-speed data

7    over publicly owned rights-of-way?  Can you give me

8    the types or the methods?

9        A.   Well, I can't say categorically that any of

10   them do, but I can tell you instances of where

11   certain ones would not require that, and that's the

12   reason for the caveat.  Take, for example, direct

13   satellite.  You know, use Elon Musk's Starlink

14   service.  One would anticipate that that wouldn't

15   use -- that that wouldn't use public rights-of-way,

16   but I'm also not privy to Starlink's network

17   topology, so I don't know if they step their, you

18   know, their services or not through multiple hops.

19   Starlink is a lower earth orbit satellite system and

20   that constellation may very well use -- because of

21   congestion, things of that sort, they absolutely

22   could use wire line backhaul facilities to get from

23   one location to another where they bounce the signal

24   back up to a different satellite.

25            So there is just -- it's not something that

David Malfara

```
 1    can be known definitively.  It takes, you know,
 2    discovery to do that.
 3         Q.   Okay.  So let me ask you -- let me -- you
 4    mentioned direct TV.  What other methods of content
 5    delivery may not rely on transmission of high-speed
 6    data over publicly owned rights-of-way, instances
 7    that may not?
 8         A.   Nothing really comes to mind right now as
 9    far as the method of transmission.
10         Q.   You mentioned direct satellite as one.
11         A.   Pardon me?
12         Q.   You mentioned direct satellite as one
13    possibility.
14         A.   That's correct.
15         Q.   Are there any other possibilities?
16         A.   Where definitively you could say that it
17    does not use landline facilities occupying at least
18    in part public rights-of-way?  No.
19         Q.   I'm not asking definitively.  I'm saying
20    possibly, it's possible, there may be cases.
21         A.   Sure.
22         Q.   So what --
23         A.   Sure.
24         Q.   You mentioned direct satellite is one.  What
25    are other possible examples?
```

David Malfara

```
 1      A.   Short hop mobile is another.  So if you have

 2   mobile communication where it is a short hop and the

 3   cellular provider has decided to use spectrum

 4   backhaul, which is very expensive, that would be a

 5   case.

 6      Q.   Any other possible cases you can think of?

 7      A.   No, no.  There were -- I'll offer this.

 8   There were instances where previously fixed wireless

 9   providers would use wireless backhaul but because

10   they used unlicensed spectrum, that has become

11   untenable in the presence of what the FCC's

12   definition is of broadband right now, which is, you

13   know, data rates exceeding what could practically be

14   provided using unlicensed spectrum for backhaul.

15      Q.   You said previously.  When would that have

16   been, how long ago?

17      A.   Five, six, seven years.

18      Q.   Can we look at Paragraph 18, please?  In the

19   first sentence you say:  Importantly, this video

20   content...

21           Are you referring to Netflix and Hulu

22   content?

23      A.   So, you know, if you could just hold on for

24   a minute, because that paragraph is rendered within

25   context.  Right?
```

David Malfara

```
1    geographically distributed array of servers, I may

2    paraphrase what the value of that is, but it's very

3    closely aligned with what's contained --

4        Q.   Okay.

5        A.   Right.

6        Q.   And this is based on the document you cite

7    in your Footnote 7?

8        A.   That's correct.

9        Q.   And did you review any other documents on

10   the open connect website other than the one you

11   cite?

12       A.   I reviewed web pages contained there that

13   simply referred back to this document, so this

14   document was the origin of all the information that

15   I put in my report.

16       Q.   Okay.  So this might have been on a web page

17   but you didn't review other documents?

18       A.   Correct.

19       Q.   Do you know whether Netflix has any open

20   connect appliances in Ohio?

21       A.   I do not.

22       Q.   Do you know whether Netflix -- whether there

23   are any Netflix -- let me start over.

24            Do you know whether there are any open

25   connect appliances in the city of Maple Heights?
```

David Malfara

```
 1      A.   I do not.

 2      Q.   Do you know who owns the open connect

 3 appliances from which people in Ohio stream content?

 4      A.   That -- no, I do not at this point.

 5      Q.   Do you know whether the -- do you know

 6 whether Internet service providers pay for open

 7 connect appliances or not?

 8      A.   I believe they do not.  I don't know that

 9 for sure but I believe they do not.

10      Q.   And in Paragraph 28 you refer to content

11 delivery network providers such as Akamai, Swarmify,

12 Rackspace, Limelight, and others.

13           Is that right?

14      A.   Yes.  Yes.

15      Q.   Do you have an understanding of whether

16 Netflix uses any of those third-party content

17 delivery networks?

18      A.   I don't know at this point.

19           I'm plugging in my phone here because it

20 will lose battery in a little bit.

21      Q.   No worries.  As long as you can still hear.

22      A.   Yep.  Perfect.  Go ahead.

23      Q.   You refer to two ways in which OCAs are

24 deployed, one is at Internet exchange points and one

25 is embedded basis within qualified ISPs.  Is that
```

David Malfara

1    Q.   Do you want to take -- do you want to take a

2    break?

3    A.   No, I'm good.  I'm good.  It's just the --

4    you know.

5    Q.   Okay.  Can you look at Paragraph 43?

6    Actually, that's okay.  Let's keep going.

7         Are you opining as to whether Netflix and

8    Hulu provide video service under the Ohio act at

9    issue here?

10   A.   No.

11   Q.   Are you opining as to whether the resolution

12   of whether Netflix and Hulu provide video service

13   under the Ohio act would be common to all

14   municipalities in Ohio?

15        MR. HAWAL:  Objection; form.

16   A.   Yeah.  Could you restate that?

17   Q.   Sure.  Are you opining as to whether the

18   determination of whether Netflix and Hulu provide

19   video service could be answered in a common way for

20   all municipalities in Ohio?

21   A.   I am not.  I'm opining as to the plumbing

22   that exists in common in those locales.

23   Q.   Are you opining that under the plain

24   language of the Ohio act, calculation of the video

25   service provider fee is based solely on the service

1    address at which subscribers are located and not

2    where and how they ultimately view each and every

3    piece of programming?

4        A.   I am not.

5        Q.   Are you opining that Netflix and Hulu

6    provide the exact same video programming?

7        A.   I am not.

8        Q.   Are you opining that Netflix and Hulu

9    provide the video -- let me start that again.

10           Are you opining that Netflix and Hulu

11   provide video programming delivered in the exact

12   same manner?

13       A.   I am not.

14       Q.   Are you opining that Netflix and Hulu

15   provide the exact same video programming delivered

16   in the exact same manner no matter where their

17   subscribers reside in the state of Ohio?

18       A.   I am not.

19       Q.   Are you opining that Netflix and Hulu's

20   video programming is transmitted in the same manner

21   to subscribers located in all municipalities,

22   townships and counties in the state of Ohio?

23           MR. HAWAL:  Objection; form.

24       A.   Yeah, the question is ambiguous.  Could you

25   restate it in a way that, you know -- the way you

David Maffara

```
 1    stated it, the answer may be one way for one and

 2    another way for the other.

 3        Q.   Okay.  I'll state it again and if you don't

 4    understand it, you can tell me why and I'll try to

 5    clarify that.

 6        A.   Okay.

 7        Q.   Is that fair?

 8        A.   Yes.

 9        Q.   Okay.  Are you opining that Netflix and

10    Hulu's video programming is transmitted in the same

11    manner to subscribers located in all municipalities,

12    townships and counties in the state of Ohio?

13        A.   Okay.  My answer is that to my knowledge at

14    this point in discovery, I don't believe that Hulu

15    and Netflix in the first case transmit their content

16    in the same manner.

17        Q.   Okay.

18        A.   So that -- you know, it's a complex

19    question, is what you're asking.

20             Second of all, do I believe that, as it

21    pertains to each provider, do I believe that each

22    provider is using the same manner of transmission?

23    I would say I have no reason to dispute the fact

24    that Netflix has a uniform method of delivery that

25    would be consistent across those municipalities and
```

David Malfara

1    A.   Possibly, but I would hesitate to give, you

2   know, a list, especially an exhaustive list of

3   information that I would like to see to determine --

4   really, simply to prove in things that my experience

5   already tells me are absolutely true, yes.

6    Q.   So I'm not going to hold you to anything

7   conclusive or complete, but what type of information

8   do you think would be important for you to consider

9   from the City of Maple Heights in connection with

10   your conclusions?

11    A.   Permitting records might be one, where I

12   would ask for permitting records of Internet service

13   providers, or those who were charged with the

14   construction of those facilities, route maps

15   outlining different rights-of-way that the

16   municipality would have.

17         I would understand that -- you know, first

18   of all, what I've asked -- what I've been asked to

19   do by counsel would require a more in-depth

20   investigation into those sorts of things.

21    Q.   Great.  So you're familiar, since you grew

22   up, that in Ohio there are different types of

23   municipalities, correct?

24    A.   Yes.

25    Q.   There are cities and villages, right?

David Malfara

1      A.   Yeah.

2      Q.   Do you still have almost 100 percent

3   certainty that the public rights-of-way of a

4   municipality is used when we're talking about the

5   municipalities in Appalachia portions of Ohio?

6      A.   No, because I'm not familiar with their

7   right-of-way construct.

8      Q.   Okay.  So for parts of Ohio, you're not

9   100 -- nearly 100 percent confident, you actually

10   just don't know?

11          MR. HAWAL:  Objection.

12      A.   To the extent that it requires further

13   investigation, that would be correct, but as I said,

14   I'm speaking from my experience and not true fact

15   information from each location.  Okay?  So to my

16   experience --

17      Q.   Okay.  Well, I want -- let's rely on your

18   experience.

19      A.   Yeah.

20      Q.   46 years of experience.  Let's go with

21   Stafford, Ohio.  How many people are in Stafford,

22   Ohio, do you know?

23      A.   I have no idea.  I have no idea.

24      Q.   81, 81 residents in Stafford, Ohio.

25      A.   Okay.  Okay.

David Malfara

```
 1    talked about Marblehead.  Who lives in Marblehead,

 2    again?

 3        A.   Well, my parents and that's where I'm from.

 4        Q.   Awesome.

 5        A.   But by the way, you cut me off a little bit

 6    on the previous statement.

 7        Q.   I'm sorry.

 8        A.   What I was going to say is I have not done

 9    that in Ohio, but the state immediately to the west

10    of Ohio is Indiana and I have done it there.

11        Q.   But you're not saying what's true in Indiana

12    is necessarily true in Ohio?

13        A.   Oh, I am to a certain extent, yes.

14        Q.   Okay.  Okay.  Your report, I guess, since

15    nothing is specific to Ohio, basically assumes what

16    happens in one state is true in another state then,

17    right?

18             MR. HAWAL:  Objection.

19        A.   On a predominant basis, yes, with regard

20    to certain -- with regard to stipulations that I've

21    identified as such.

22        Q.   Let's talk about Marblehead.  Do you know

23    what the population of Marblehead is?

24        A.   I think it's around 1,000 in the winter and

25    around 80,000 in the summer.
```

David Malfara

1    A.   Again, I think I've answered that question.

2    Based on my experience, I would absolutely consider

3    it highly likely, not just likely but highly likely

4    that they did, and in fact, with just, you know --

5    with the Marblehead example, you know, that proves

6    the rule rather than the exception.

7    Q.   And you're willing to say that -- do you

8    think it's fair to conclude that without actually

9    examining the facts of Marblehead?

10   A.   My experience tells me it is.

11   Q.   Even though there are only 825 residents

12   there and you're not aware of any that actually

13   subscribe to Hulu or Netflix except for your

14   relatives?

15   A.   Again, because of the fact that I know that

16   the predominant ISP is a nationwide provider of

17   Internet access service, yes, that's absolutely

18   plausible.

19   Q.   If I told you the two Hulu subscribers in

20   Marblehead use satellite, would you still be equally

21   confident in your conclusion?

22   A.   Okay.  Would you -- I'm sorry.  Say it

23   again.  That --

24   Q.   If I told you there were only two Hulu

25   subscribers in Marblehead, because there are only,

1    like, 815 people to begin with, and they use

2    satellite to connect to the Internet, would you

3    still insist, based on your years of experience,

4    that the public rights-of-way of Marblehead are

5    used?

6          MR. HAWAL:  Objection; form.

7       A.   Okay.  I would say that it's unknown because

8    of the fact that even that satellite service might

9    use land lines to provide service to Marblehead.

10   I --

11      Q.   Isn't the answer unknown without looking?

12      A.   Well, the answer is unknown without looking,

13   yes, in Marblehead, that's correct.

14      Q.   Okay.  The --

15      A.   I find it highly unlikely, though, that Hulu

16   only has two subscribers that -- and they only use,

17   you know, satellite service, because I happen to

18   have a nephew who I know uses Hulu service who has

19   Spectrum Internet, so I, you know, I don't believe

20   that you're, you know, that you're underlying data

21   is correct.

22      Q.   Well, no.  Obviously, once you look, right,

23   you can actually confirm if it's been used or not.

24   I mean, if I actually --

25      A.   Well, this is -- okay.  So, Victor -- okay.

David Maffara

```
 1    So this is what I'm saying, Victor.  I have an
 2    understanding and I'm willing to stipulate, based on
 3    my experience, okay, that the public rights-of-way
 4    are used by every wire line ISP, and to the extent
 5    that services are provided to subscribers of wire
 6    line service, which I put in my report, okay, then I
 7    am very comfortable stating that those services
 8    transit a public right-of-way, and that's --
 9        Q.   But you are not saying -- but you are not
10    saying that the public rights-of-way belonging to
11    any particular municipality are being used, correct?
12        A.   No, I'm not, without further investigation.
13    That is true, yes.
14        Q.   Perfect.  We talked about the terabit and
15    the fact that a single optic line --
16        A.   -- (garbled audio) --
17        Q.   Right, like -- just like a micron's
18    thickness, you said can carry a terabyte of
19    information, correct?
20        A.   That's correct.
21        Q.   So when lines are laid into the ground,
22    like, obviously you dig up -- like the cable company
23    will go in and put these lines in, they build -- I
24    guess there is a certain bandwidth, right, that when
25    they are laying it down there, that you can use,
```

David Maffara

```
 1              C E R T I F I C A T E

 2         I, Susan D. Wasilewski, Registered

 3    Professional Reporter, Certified Realtime Reporter,

 4    Certified Manager of Reporting Services, Certified

 5    Realtime Captioner, and Florida Professional

 6    Reporter, hereby certify that the witness named

 7    herein appeared via Remote Counsel/Zoom technology

 8    on Thursday, April 29, 2021, and was duly sworn.

 9         I FURTHER CERTIFY that I was authorized to

10    and did stenographically report the examination of

11    the witness named herein; that a review of the

12    transcript was requested; and that the foregoing

13    transcript is a true record of my stenographic

14    notes.

15         I FURTHER CERTIFY that I am not related to

16    or an employee of any of the parties, nor am I

17    related to or an employee of any of the parties'

18    attorneys or counsel connected with this action, nor

19    am I financially interested in the outcome of this

20    action.

21         WITNESS my hand this 5th of May, 2021.

22

23    _____

24    Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```